BLANK ROME LLP
Attorneys for Plaintiff
405 Lexington Avenue
New York, New York 10174
(212) 885-5000
John D. Kimball
Alan M. Weigel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DUCKY-MOMO, LLC, <br><br> Plaintiff, <br><br> -against- <br><br> ROBERT E. DERECKTOR, INC., E. PAUL DERECKTOR, THOMAS E. DERECKTOR, MICAH TUCKER, ELIZABETH WEATHERBORN, *in personam*, <br><br> -and- <br><br> M/Y "INDEPENDENCE," *in rem*, <br><br> Defendants | Civil Action No. <br><br><br><br><br><br><br><br><br><br> **VERIFIED COMPLAINT** |

Plaintiff Ducky-Momo, LLC by its attorneys, Blank Rome LLP, for its Verified Complaint, alleges upon information and belief as follows:

## JURISDICTION

1.    This is a case of admiralty and maritime jurisdiction, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiff is seeking relief under Supplemental Rules D and E of the Supplemental Rules for Certain Admiralty or Maritime Claims.

2.    The Court has subject matter jurisdiction under 28 U.S.C. § 1333.

1

3. Venue is proper in this Court because the *in rem* Defendant, during the pendency of this action, is or will be within the Southern District of New York and within the jurisdiction of this Court.

## THE PARTIES

4. At all material times, Plaintiff Ducky-Momo, LLC ("Owner') was and now is a limited liability company organized and existing under the laws of Delaware with a registered office at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

5. Defendant Robert E. Derecktor, Inc. ("Derecktor") is a corporation organized and existing under the laws of the State of New York with a principal place of business at 311 East Boston Post Road, Mamaroneck, New York, and is in the business of, among other things, repairing and refitting yachts and commercial boats.

6. At all material times, Defendant E. Paul Derecktor ("Paul Derecktor") was and is a citizen of the State of New York and was and is President of Derecktor.

7. At all material times, Defendant Thomas E. Derecktor ("Thomas Derecktor") was and is a citizen of the State of New York and was and is an officer of Derecktor.

8. Defendant Micah Tucker ("Tucker") was and is a citizen of the State of New York and was and is General Manager of Derecktor.

9. Defendant Elizabeth Weatherborn ("Weatherborn") was and is a citizen of the State of New York and was and is an employee of Derecktor.

10. *In rem* defendant, M/Y "INDEPENDENCE" (the "Yacht"), is a 1984 built, 96 foot, 171 gross ton, Burger Boat Company, motor yacht bearing Hull Identification Number BRGJ397CG484 and assigned U.S. Coast Guard documentation number 669820.

## ALLEGATIONS OF FACT

11. At all material times, Plaintiff Ducky-Momo, LLC was and now is the registered owner of the Yacht.

12. At all material times, Matthew J. Bruderman ("Bruderman") was and now is a General Manager of Owner.

13. At all material times, Verdes Treblanche ("Treblanche") was and now is the Yacht's Captain.

14. In August 2013, Derecktor was engaged to inspect the Yacht and prepare a bid for refitting various equipment and painting the hull and superstructure. On at least two separate occasions, Derecktor and its personnel had access to the Yacht in order to assess the work to be done. The first occasion was when Derecktor personnel visited the Yacht at Seawanhaka Corinthian Yacht Club in Oyster Bay, New York ("Seawanhaka"). The second occasion was when the Yacht was taken to Derecktor's shipyard. Thereafter, the Yacht was returned to Seawanhaka.

15. Between August and November 2013, Derecktor and Owner negotiated the scope of the work to be accomplished and Derecktor offered several estimates for the cost of that work. Bruderman had heard rumors that Derecktor was in bankruptcy and thus asked Derecktor whether any bankruptcy issues might affect the work to be done on the Yacht. Tucker informed Bruderman that Derecktor was not in bankruptcy and that Derecktor's bankruptcy issues had nothing to do with the shipyard in Mamaroneck, New York.

16. On November 22, 2013, Derecktor offered Owner an estimate of $343,835.00 to modify the Yacht's transom to install a new swim platform, refit and repair the Yacht's windows and hatches, and paint the Yacht's hull, topsides and superstructure.

17. Portions of the November 22, 2013 estimate were accepted by Owner on December 2, 2013, with the stipulation that Owner would not pay for hauling, blocking and moving, and painting should be for an amount not to exceed $128,000.

18. Derecktor's estimate contained only cursory written descriptions of the work to be performed on the Yacht. Accordingly, Owner requested that Derecktor provide owner with more detail (*e.g.*, shop drawings), and receive Owner's approval of the same, prior to Derecktor's commencement of work on the Yacht. Derecktor agreed to Owner's request.

19. On December 15, 2013, the Yacht was delivered to Derecktor's yard for modification of the transom and swim platform, a refit of doors and windows, and painting of the hull.

20. On December 16, 2013, Owner made a payment of $100,000.00 to Derecktor as a deposit for the work to be accomplished on the Yacht.

21. Derecktor hauled the Yacht out of the water on January 20, 2014.

22. Shortly thereafter, and without providing Owner any further detail regarding the work to be performed on the Yacht, let alone receiving Owner's approval of the same, Derecktor cut off the back of the Yacht, rendering the vessel incapable of being placed back in the water.

23. After cutting off the back of the Yacht, Derecktor advised that the actual costs would be significantly higher than the estimated costs, with the cost of some jobs, such as painting, being three times higher than estimated. Upon information and belief, Derecktor has habitually made excessive demands for payment not only from Owner, but also from other former customers of Derecktor, by drastically increasing the amount of its estimates after Derecktor has taken possession of and incapacitated its customers' vessels.

4

24. By March 11, 2014, Derecktor had issued five invoices totaling $122,728.89 for work it allegedly performed on the Yacht.

25. On March 25, 2014, Owner made a payment to Derecktor of $50,000.00 as a progress payment for work allegedly accomplished.

26. Between March 25 and July 4, 2014, Derecktor issued seven further invoices totaling $128,862.88 for additional work Derecktor alleged it had performed on the Yacht, as well as for dockage and storage charges

27. By September 12, 2014, disputes had arisen between Derecktor and Owner over the scope of the work that had been accomplished, billing, and payment of invoices. All expected work on the Yacht was not complete, and Derecktor ceased working on the Yacht after Owner refused to accede to Derecktor's unjustified increase in Derecktor's previously-issued estimates. Windows had not been fully refit, and the transom and swim modifications, and painting had not been completed.

28. A meeting was held at Derecktor's yard on September 12, 2014, (the "9/12/14 Meeting") by Bruderman, Treblanche, Tucker and Thomas Derecktor. Daniel E. Jacobson, Secretary and General Counsel of Owner ("Jacobson"), also attended the meeting. Shortly thereafter, Tucker and Thomas Derecktor gave Bruderman, Jacobson and Treblanche an estimate that it would take three to four months to finalize the work that the parties agreed during the 9/12/14 Meeting would be completed. It later became clear that this estimate was false and Tucker and Thomas Derecktor both knew or should have known it was false at the time they made it.

29. At the time, Owner was contemplating removing the Yacht from Derecktor's yard and having it moved to a warmer climate in order to safeguard the Yacht during the winter

months and to provide a more conducive climate for the work that still needed to be performed on the Yacht. Derecktor assured Owner that the Yacht would be kept in a heated environment and that all work yet to be performed could be done by Derecktor at its facilities over the ensuing three to four months.

30. At the time Tucker and Thomas Derecktor made their false statements to Bruderman, Jacobson, and Treblanche, Derecktor was in Chapter 11 bankruptcy proceedings. Unknown to Owner, Derecktor was relying on Owner's payments to fund a significant portion of its operating expenses, and had neither the financial assets nor sufficient personnel to complete repairs to the Yacht within the estimated time frame, or for the dollar amount agreed to in the 10/2/14 Settlement (hereinafter defined).

31. Notwithstanding that all work on the Yacht was not complete, on September 22, 2014, in an attempt to artificially inflate the amount allegedly owed by Owner to Derecktor, Derecktor issued an invoice totaling $20,956.32 for dockage and storage charges which had never previously been discussed with Owner. The issuance of this invoice was solely attributable to Derecktor's bad faith.

32. On October 2, 2014, in reliance on Derecktor's and Tucker's false representations as to both the time necessary to complete repairs to the Yacht, as well as the cost of said repairs, Owner and Derecktor reached an agreement (the "10/2/14 Settlement") by which Owner would pay Derecktor $200,000.00, which included the outstanding balance for work allegedly already accomplished, a payment for laydays (*i.e.*, a fee for days when the Yacht was present in Derecktor's yard, but not being worked on), and a payment for the completion of all remaining work agreed to during the 9/12/14 Meeting.

6

33. Payment of the 10/2/14 Settlement was to be effected by a $75,000.00 initial payment, bi-monthly progress payments of $15,000.00 for three months totaling $90,000.00, and a final payment of $35,000.00 upon completion of all remaining work to Owner's satisfaction.

34. It was also agreed that additional items not included within the scope of the additional work, but which were needed to make the Yacht operational, would be billed on a time and materials basis.

35. By February 4, 2015, Owner had made the agreed upon initial payment, all bi-weekly progress payments and a payment of $20,000.00 for additional work that the parties agreed, subsequent to the 10/2/14 Settlement, would be done to the Yacht.

36. After Derecktor hauled the Yacht in January 2014, the Yacht was placed in an unheated storage building where it remained through July 2015, despite the fact that Derecktor assured Bruderman the Yacht would be kept in a heated shed. While in storage, the Yacht suffered significant cold weather related damages, including buckling of the dining solon floor, and freezing and rupture of pipes, many behind bulkheads. Subsequently, the ruptured pipes leaked, causing water damage.

37. Although all remaining work pursuant to the 10/2/14 Settlement had not been completed, Derecktor launched the Yacht back into the water on July 22, 2015.

38. Derecktor launched the Yacht in a dangerous and unseaworthy condition. Bilge pump overboard discharge lines that were cut in order to make transom modifications have been left to drain into the lazarette and covers have not been installed over storage areas open to the weather. As a result, the Yacht has been left in a condition where there is a significant risk of it foundering at its berth.

39. Work which was to have been completed as part of the 10/2/14 Settlement was not completed. The hydraulics for the swim platform were not installed, crew port lights were not repaired, the cockpit was not painted, the rub rail was not installed around the edge of the swim platform, no hatch was ever built for the bench installed on the fixed swim platform, the flybridge helm chairs were not installed, no handles were provided for the main or aft salon windows, and sea chest covers were cracked. In addition, the new paint job on the sides of the hull is marred with glue drippings.

40. Between approximately February and June 2015, Bruderman repeatedly requested that Derecktor advise as to the status of the repairs to the Yacht, given that the work should have been completed, in accordance with the 10/2/14 Settlement, by February 2015. In response to these requests, Derecktor insisted that work on the Yacht was continuing.

41. In June 2015, Tucker informed Bruderman that Derecktor required $50,000.00 to complete the work on the Yacht, and stated that Derecktor did not even have money to buy the hydraulics that were to be installed as part of the 10/2/14 Settlement. Shortly thereafter, Bruderman requested invoices detailing the work done to date.

42. On August 7, 2015, Derecktor sent four invoices for additional work totaling $35,787.51.

43. On September 30, 2015, Derecktor's counsel sent Owner's counsel four invoices for additional work which included two of the invoices sent on August 7 and two new invoices, all totaling $54,970.23. One of the new invoices provided by Derecktor's counsel included, in yet another attempt to artificially inflate the amount allegedly owed by Owner to Derecktor, charges of $40,696.47 for dockage which were not part of the 10/2/14 Settlement and which were solely attributable to Derecktor's bad faith.

44. Derecktor's counsel offered to allow Owner to take the boat out of Derecktor's yard for a payment of $36,000.00, on the condition that Owner sign a full release. Because of the extensive damage the Yacht suffered while in Derecktor's custody and control, coupled with the fact that all of the work pursuant to the 10/2/14 Settlement had not yet been completed, Owner was not willing to sign a release.

45. Despite Derecktor's counsel representing that the amount due and outstanding for work accomplished on the Yacht was $54,970.23, on October 8, 2015, Weatherborn sent Owner three new invoices totaling $505,437.03. The three new invoices were fraudulent in that they (i) included double billing for charges for work allegedly accomplished and invoiced and paid for by Owner in 2014 as if the work had actually been accomplished in September 2015, (ii) contained items already billed on the invoices sent to Owner on August 7 and September 30, 2015, and (iii) contain charges for items that were part of the 10/2/14 Settlement. Weatherborn and Thomas Derecktor knew there was no justification for these invoices, but sent them anyway.

46. On or about October 9, 2015, Paul Derecktor called Bruderman and made threats against Bruderman's personal safety as well as the Yacht.

47. On October 10, 2015, Bruderman, Treblanche, and three other crew members went to Derecktor's yard to remove the Yacht and bring it back to Seawanhaka. They were stopped by Paul Derecktor, however, and were escorted off the premises by Mamaroneck police.

48. Although no charges were filed against Bruderman, Treblanche, or the crew, they were accused by Mamaroneck police of trespassing, despite the fact that they went to Derecktor's by boat and went from that boat directly onto the Yacht.

49. Following Owner's failed attempt to take redelivery of the Yacht, Derecktor blocked the Yacht's path of egress with other vessels and has been unlawfully holding the Yacht ever since.

50. As a result of being barred from the Yacht, Owner's crew has been unable to verify the Yacht's condition and to take steps to protect the Yacht from the anticipated inclement winter weather.

51. On October 15, 2015, Derecktor filed a demand for arbitration against Bruderman with the American Arbitration Association alleging that Derecktor is owed $545,735.71 for repairs to the Yacht.

52. By its own terms, however, that arbitration demand has lapsed and is no longer in effect.

### COUNT I

#### RELIEF PURSUANT TO SUPPLEMENTAL RULE D FOR CERTAIN ADMIRALTY AND MARITIME CLAIMS

53. Plaintiff repeats and re-alleges the allegations set forth in the foregoing paragraphs as if set forth in full herein.

54. Owner has fully performed all terms and conditions of the maritime contract to repair the Yacht on its part to be performed and remains prepared to pay any remaining costs for repairs actually accomplished, but Defendants refuse to redeliver the Yacht to Owner unless Owner provides an escrow deposit to cover the full value of Derecktor's false and grossly inflated claim of $545,735.71. Defendant's demand for security is manifestly unreasonable.

55. Defendants' seizure of the Yacht and barring Owner and Owner's crew from boarding the Yacht, which is Owner's rightful property, is unlawful and not permitted by any terms of the maritime contract to repair the Yacht.

10

56. Despite demand, Defendants have refused to return the Yacht and Owner has been wrongfully denied its rights of use and enjoyment.

57. In the circumstances, Owner has a right of immediate possession of the Yacht, which is within this District and within the jurisdiction of this Honorable Court, pursuant to Supplemental Rule D of the Federal Rules of Civil Procedure.

## COUNT II

### REPLEVIN

58. Plaintiff repeats and re-alleges the allegations set forth in the foregoing paragraphs as if set forth in full herein.

59. In the alternative, by reason of the preceding premises, Defendants have unlawfully detained the Yacht from Owner, who is entitled to its possession and recovery pursuant to Rule 64 of the Federal Rules of Civil Procedure.

## COUNT III

### CONVERSION

60. Plaintiff repeats and re-alleges the allegations set forth in the foregoing paragraphs as if set forth in full herein.

61. In the alternative, by reason of the preceding premises, Defendants have wrongfully converted the Yacht from Owner.

## COUNT IV

### BREACH OF MARITIME CONTRACT

62. Plaintiff repeats and re-alleges the allegations set forth in the foregoing paragraphs as if set forth in full herein.

63. Defendants have breached the maritime yacht repair contract by failing to complete all agreed upon repairs in a timely manner and within the agreed upon time period and

by failing and refusing to redeliver the Yacht to Owner. Defendants also have breached the 10/2/14 Settlement agreement by failing to complete the agreed upon repairs within the agreed upon time period and for the agreed upon price. Although Owner has paid Derecktor the sum of $ 335,000.00 for a rebuilt transom, swim platform, refit of windows and the electrical system, Derecktor breached its agreements with Owner by neglecting and failing to make the proper repairs required to be made, by failing to furnish all components required to be installed, and by leaving the Yacht in a dangerous and unseaworthy condition.

64. Defendants have left the yacht in damaged condition and the cost of restoring the yacht and repairing the damage cannot be determined at this stage without detailed on-site inspections.

65. Despite repeated demands by plaintiff, Derecktor has failed, neglected, and refused, and continues to refuse, to correct the dangerous and unseaworthy conditions resulting from its improper work performed on the Yacht.

66. By reason of Derecktor's failure to properly complete all repairs and return the Yacht to Owner in a seaworthy condition, Owner has not been able to use the vessel and has suffered damages in an amount to be determined.

## COUNT V

## **LOSS IN VALUE OF THE YACHT**

67. Plaintiff repeats and re-alleges the allegations set forth in the foregoing paragraphs as if set forth in full herein.

68. The fact that the Yacht has been negligently repaired and suffered (and continues to suffer) damage while in Derecktor's care and custody will affect the market value of the Yacht because damage to items of luxury goods is known to the marketplace. The market place for a

Yacht the size of the vessel herein is a small world, and yachts develop a reputation within that world quickly. In this instance, the fact that the damages occurred from cold weather and while in a shipyard is an added factor in driving down the market value of the Yacht. Prospective buyers and brokers will seek access to any history of the Yacht and such history will be used to negotiate a better price. A prospective buyer of the Yacht will demand a price reduction because of the negligent repairs and damages suffered while in Derecktor's care, custody and control.

69. As best as can be presently estimated, the negligent repairs and damage to the Yacht has caused a 10 – 20% loss in the present value of the Yacht, or approximately $165,000 – $330,000, for which Defendants are liable to Owner.

## COUNT VI

### NEGLIGENCE

70. Plaintiff repeats and re-alleges the allegations set forth in the foregoing paragraphs as if set forth in full herein.

71. In the alternative, by reason of the preceding premises, Derecktor failed to perform repairs to the Yacht in a workmanlike manner, used sub-standard materials or materials not in accordance with the agreed specifications and otherwise exercised poor workmanship and was negligent in the repair of the Yacht.

72. While in the sole care, custody, and control of Derecktor, the Yacht sustained (and continues to sustain) serious structural damages by reason of the recklessness, carelessness, and negligence of Derecktor and without any fault or negligence on the part of Owner when Derecktor, on its own initiative, stored the Yacht in a location without suitable protection from cold weather.

73.     As a result of Derecktor's recklessness, carelessness and negligence, the Yacht sustained serious damages, including buckling of the dining solon floor, frozen and burst pipes and water damage.

74.     Derecktor has refused and continues to refuse to make the necessary repairs to the damages caused by its own recklessness, carelessness, and negligence.

75.     By reason of the foregoing, Owner has sustained damages in an amount to be determined.

## COUNT VII

### GROSS NEGLIGENCE

76.     Plaintiff repeats and re-alleges the allegations set forth in the foregoing paragraphs as if set forth in full herein.

77.     Defendants owed and breached duties of ordinary and reasonable care and workmanlike performance in the repair of the Yacht and additionally owed and breached duties to Owner to guard against and/or prevent damages to the Yacht while it was in Defendants' care, custody, and control.

78.     Defendants breached their legal duty to Owner and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent failure to repair and care for the Yacht.

79.     Defendants knew or should have known that their wanton or reckless conduct would foreseeably cause damages to Owner's property.

80.     As a direct and proximate cause of Defendants' wanton or reckless acts, Owner has suffered property damage and incurred other expenses related to damages to the Yacht.

81.     Defendants' wanton or reckless conduct, as described herein, entitles Owner to punitive damages. The amount of punitive damages recoverable by Owner is not lawfully

14

limited to the amount of their compensatory damages, but rather should be a multiplier of same sufficient to both punish Defendants and deter similar wrongdoing in the future.

## COUNT VIII

### FRAUDULENT MISREPRESENTATION AGAINST ALL DEFENDANTS

82. Plaintiff repeats and re-alleges the allegations set forth in the foregoing paragraphs as if set forth in full herein.

83. As detailed with particularity herein, Defendants falsely misrepresented to Owner the amount of time in which repairs could be completed and the cost of such repairs.

84. In each instance, Defendants made these false statements with full knowledge of their false nature and with the intent to deceive Owner and to create an air of reliability and expertise for the proposed repairs to the Yacht.

85. Owner took action in reliance on these statements in leaving the Yacht in Derecktor's care and custody and continuing to fund repairs.

86. Owner suffered injury and damage as a proximate result of its reliance on Defendants' negligent misrepresentations.

## COUNT IX

### FRAUD AGAINST ALL DEFENDANTS

87. Plaintiff repeats and re-alleges the allegations set forth in the foregoing paragraphs as if set forth in full herein.

88. The actions of the named Defendants, and each of them as detailed with particularity above, constitute acts of fraud.

89. Owner is entitled to recover damages for losses caused by Defendants' fraud in in an amount to be determined, along with and punitive damages and attorneys' fees and costs.

## COUNT X

## **CONSPIRACY TO DEFRAUD AGAINST ALL DEFENDANTS**

90. Plaintiff repeats and re-alleges the allegations set forth in the foregoing paragraphs as if set forth in full herein.

91. The actions of the Defendants, and each of them, constitute acts of conspiracy to defraud by which, based *inter alia* on promises of the timely completion of repairs to the Yacht, Defendants obtained and continued to obtain payments from Owner for work which Defendants knew they would not and could not complete and with the intent to defraud Owner.

92. Owner is informed and believes, and on that basis alleges, that the acts of the Defendants as set forth above were fraudulent, oppressive, and that the Defendants knew or reasonably should have known that their actions were to induce Owner to continue to provide payment for repair services for which Derecktor had neither the financial capacity or adequate personnel to complete and would not and could not accomplish. Nevertheless, Defendants made these inducements, including the promises of timely completion so as to encourage and facilitate payments to obtain personal gain and in breach of applicable law.

93. Owner is entitled to recover, over and above the amounts of damages to the Yacht and resulting expenses, punitive damages against Defendants, jointly and severally, in amounts subject to proof at trial.

146714.00601/101756094v.1

## COUNT XI

## **PUNITIVE DAMAGES**

94. Plaintiff repeats and re-alleges the allegations set forth in the foregoing paragraphs as if set forth in full herein.

95. Defendants engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the repair and safekeeping of the Yacht, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence.

96. Defendants recklessly, willfully and/or wantonly caused damages to the Yacht by their tortious manner in which repairs were effected.

97. Defendants recklessly, willfully and/or wantonly failed to ensure that the Yacht was adequately protected from damages while it was in Defendants' care, custody, and control.

98. Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risk of property damage to others in favor of financial advantage to Defendants, and the need to punish Defendants and deter further repetition by Defendants or others.

99. Accordingly, Owner is entitled to an award of punitive damages in an amount to be determined at trial.

100. Defendants falsely represented to owner and gave assurances the agreed work would be accomplished in a period of three to four months when they knew or should have known that was not true.

**WHEREFORE**, Plaintiff prays:

1. That process be issued and the U.S. Marshal be directed to arrest the Yacht pursuant to Supplemental Rule D of the Federal Rules of Civil Procedure

2. In the alternative, the process be issued and the U.S. Marshal be directed to seize the Yacht pursuant to Rule 64 of the Federal Rules of Civil Procedure;

3. That judgment be entered directing the immediate turnover of the Yacht to Owner pursuant to Supplemental Rule D or, in the alternative, Fed. R. Civ. P. 64;

4. In the alternative, that judgment be entered against Defendants for their unlawful breach of maritime contract, and the 10/2/14 Settlement, and/or conversion of the Yacht, negligence, and/or gross negligence, in the amount of damages proved at trial, and punitive damages, costs and reasonable attorneys' fees;

5. That judgement also be entered against Defendants, jointly and severally, for their fraud and conspiracy to defraud, in the amount of damages proved at trial, and punitive damages, costs and reasonable attorneys' fees; and

6. That Plaintiff have such other and further relief as may be just and proper.

Dated:     New York, New York
               November 30, 2015

                                             Respectfully submitted,
                                             BLANK ROME LLP
                                             Attorneys for Plaintiff

                                             By _____
                                             John D. Kimball
                                             Alan M. Weigel
                                             405 Lexington Ave.
                                             New York, NY 10174
                                             Tel.: (212) 885-5000
                                             jkimball@blankrome.com
                                             aweigel@blankrome.com

BLANK ROME LLP
Attorneys for Plaintiff
405 Lexington Avenue
New York, New York 10174
(212) 885-5000
John D. Kimball
Alan M. Weigel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DUCKY-MOMO, LLC, <br><br> Plaintiff, <br><br> -against- <br><br> ROBERT E. DERECKTOR, INC., E. PAUL DERECKTOR, THOMAS E. DERECKTOR, MICAH TUCKER, ELIZABETH WEATHERBORN, *in personam*, <br><br> -and- <br><br> M/Y "INDEPENDENCE," *in rem*, <br><br> Defendants | Civil Action No. <br><br><br><br><br><br><br><br><br><br> **VERIFICATION** |

Pursuant to 28 U.S.C. § 1746, Matthew J. Bruderman hereby declares under penalty of perjury:

1. That he is a General Manager of the Plaintiff company in the action herein; that he is authorized to act on behalf of the Plaintiff; that he has read the foregoing Verified Complaint and knows the contents thereof and that the same are true to the best of his knowledge, information, and belief

2. That the sources of deponent's information and the grounds for his belief are his own personal knowledge and documents possessed by the Plaintiff.

3. That he verifies under penalty of perjury that the foregoing is true and correct.

Executed on November 30, 2015.

*/s/ Matthew J. Bruderman*
Matthew J. Bruderman